**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Linda Rieser, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:04-cv-379 |
| | ) | |
| University of Cincinnati, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

This matter is before the Court on Defendants' motion for summary judgment (doc. 23).  For the reasons that follow, Defendants' motion for summary judgment is **GRANTED.**

I.  Introduction

Plaintiff, a female citizen of the State of Indiana, brings a claim for sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq., against Defendant the University of Cincinnati (hereinafter, "UC").  Plaintiff also brings a claim for sex discrimination under Ohio Revised Code § 4112.02(A) against Defendants Anant Kukreti, Makram Suidan, Paul Bishop, Stephen Kowel and Roy Eckart, employees of UC.  Plaintiff claims that during her twenty-two year tenure as an employee of UC in its Nuclear and Civil Engineering Departments, she was denied equal

1

access to salary and raises, funding from various sources, and necessary workspace as compared to similarly-situated male researchers; she was denied a promotion while similarly-situated males were promoted; and she was terminated from her employment based on her sex.  The Court has subject matter jurisdiction over plaintiff's Title VII claim pursuant to 28 U.S.C. § 1331.  The Court has subject matter jurisdiction over plaintiff's state law claim against the individual Defendants under 28 U.S.C. § 1332 because plaintiff and the individual Defendants are citizens of different states and the amount in controversy exceeds $75,000.00.

## II. Background

Plaintiff's formal education is limited to a high school diploma.  Plaintiff was originally hired by UC on February 12, 1982, as a Junior Research Associate in the College of Engineering's Chemical and Nuclear Engineering Department.  Her employment initially ended in January 1983 when UC stopped receiving the funds out of which she was being paid.  UC re-hired Plaintiff in April 1986 as a Junior Research Associate in the Nuclear Engineering Department.  Plaintiff claims that the 1986 position into which she was hired required a bachelor of science degree "or the equivalent."  She further claims that until near the end of her employment, UC treated her as having the equivalent of a bachelor of science degree and a masters degree.

Plaintiff was promoted to Research Associate in 1988 and to Senior Research Associate in 1990.  She was subsequently promoted to Research Director or "Director

Academic" in 1993.  As Research Director, Plaintiff performed testing and research.

While at UC, in addition to working in the Nuclear Engineering Department, Plaintiff

worked in the Civil and Environmental Engineering Department (hereinafter, "CEED") of

the College of Engineering, where she remained until her employment was terminated on

April 14, 2003.

At all times during her employment with UC, Plaintiff was an untenured, exempt

salaried employee in the unclassified civil service.  She was ultimately responsible to the

Dean of the College of Engineering.  At no time did she ever become a member of the

faculty.  According to Plaintiff, she was the only female hired into a technical position in

the Nuclear and Civil Engineering Departments of UC from 1982 until her discharge in

2003.

Defendant Stephen Kowel became Dean of the College of Engineering in 1999.

During 2000, Kowel informed Plaintiff that she was to obtain contract or grant work and

that funds from the contracts or grants would be the only source to pay her salary.

Plaintiff alleges that in July 2000, Kowel imposed a facially-neutral policy that was

designed to block her from obtaining funding.  The policy prohibited anyone employed

by the College of Engineering who was not a tenured or tenure-track faculty member

from serving as the sole Principal Investigator (hereinafter, "PI") on grants and contracts,

although that individual could serve as PI if a faculty member was co-PI on the grant or

3

contract.[1]

Plaintiff worked almost exclusively on research contracts or grants for the Fluor Daniel Fernald, Incorporated Closure Project (hereinafter, "Fernald") after January 1, 2000.  It was generally known to individuals in the College of Engineering that all Fernald research and testing work performed by College of Engineering employees would end in 2003 or 2004.  From January 1, 2003 until her termination, Plaintiff's records show that the amount paid to support her salary from Fernald contracts or grants decreased each month.  Plaintiff's work for Fernald and other sites ended on March 31, 2003, and no further research or testing salary funding from any source was scheduled for her after that date.  Plaintiff had no communication with anyone prior to her termination about her salary funds.

To offset the decrease in funding from research and testing at Fernald, Plaintiff's salary was increasingly paid from her Research Incentive Award account (RIA).  An RIA consists of funds that the College of Engineering provides to researchers who support the payment of their own salaries from contracts and grants they obtain.  These funds are intended to be used to secure additional funded research so that researchers can continue to fund their own salaries.  Plaintiff's final pay for April 1 through April 14, 2003 was entirely from RIA funds, leaving a negative balance in her RIA account.

Defendant Anant Kukreti, who was Plaintiff's immediate supervisor following his

---

[1]  The policy is hereinafter referred to as the "PI rule."

arrival at UC in August 2000, recommended that she be terminated effective April 14, 2003.  On March 13, 2003, Kukreti wrote Plaintiff that her employment was terminated "due to the expiration and/or non-renewal of your sponsored research project." (Plaintiff's depo. exh. 1-A).  Plaintiff sent an e-mail to Kukreti on April 3, 2003, notifying him that the termination letter had been sent to the wrong address, informing him that she needed more time to wrap up certain matters, and suggesting that UC's action did not comply with "the letter or intent of UC's policies and procedures."  (Plaintiff's depo. exh. 1-B).  On April 8, 2003, Kukreti responded to Plaintiff and informed her that "No additional funds are available in the Department to fund you, since you have utilized all the funds available to you from your grants and also your RIA funds."  (Plaintiff's depo. exh. 1-C).

At the time her employment was terminated, Plaintiff's salary was $89,602.68.  No person was hired, promoted, or transferred into Plaintiff's job after her termination and her job remained abolished.

Defendants do not allege that there were any issues with Plaintiff's job performance.  Rather, Defendants claim that Plaintiff's position was eliminated solely because of a lack of funding to pay her salary.  Defendants contend that Plaintiff had no future research or testing planned to pay her salary; UC's Business Manager had verified that Plaintiff had no additional RIA funds to be placed in her account in the future and there were no future sources of RIA funds for Plaintiff; UC and the College of

Engineering had experienced severe budget cuts since 1990 and no funds were available

to pay research employees who experienced a funding gap; and Plaintiff has admitted that

she had exhausted all her research funds from which her salary was paid.

Plaintiff claims that her performance at UC was "superb."  She alleges that over

the course of her employment, she had attracted grants and contracts totaling more than

$5 million in revenues for UC.  She asserts that the funds she generated had paid her

salary and overhead costs of UC, her department, and the College of Engineering; had

funded an account for discretionary spending controlled by the Deans and the Department

Heads; had paid tuition for masters degree students and Ph.D. students; had directly

supported the work of 30 other faculty members and employees at UC; and had supported

more than 50 students representing two colleges and 11 disciplines.  Plaintiff states that

she was awarded a patent in 1994 with another individual at UC for a process to control

hazardous and radioactive waste, which has produced licensing income of over $116,000

for UC.  She also asserts that in 2000 she received a $1,500 bonus "in recognition of

outstanding performance" as judged by Defendants Kukreti and Kowel.

### III.  Summary judgment standard

Summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The evidence presented on a motion

for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986) (emphasis in original).  The court will not grant summary judgment unless it is clear that a trial is unnecessary.  The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Id

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

IV.  Applicable law

Under the law of the Sixth Circuit, the same evidentiary framework applies to

7

discrimination claims brought under Title VII and Ohio law. <u>Mitchell v. Toledo Hospital</u>, 964 F.2d 557, 582 (6th Cir. 1992)). A plaintiff claiming discrimination may establish a prima facie case by introducing either direct or circumstantial evidence. <u>Rowan v. Lockheed Martin Energy Systems, Inc</u>., 360 F.3d 544, 547-48 (6th Cir. 2004). Direct evidence is evidence that "proves the existence of a fact without requiring any inferences." <u>Id</u>. at 548 (citations omitted).

Plaintiff may establish a prima facie case of discrimination through circumstantial evidence by showing that: 1) she is a member of the protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position lost; and 4) her position was filled by someone outside of the protected class. <u>Manzer v. Diamond Shamrock Chemicals Co</u>., 29 F.3d 1078, 1081 (6th Cir. 1994) (citing <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792, 802 (1973); <u>Gagne v. Northwestern Nat. Ins. Co</u>., 881 F.2d 309, 313 (6th Cir. 1989)).

Plaintiff may also establish the fourth prong of a prima facie case by showing that she was treated less favorably than a similarly-situated employee outside of her protected class. <u>Clayton v. Meijer, Inc</u>., 281 F.3d 605, 610 (6th Cir. 2002). In such a case, plaintiff must prove that all relevant aspects of her employment situation were similar to those of the employee with whom she seeks to compare herself. <u>Ercegovich v. Goodyear Tire & Rubber Co</u>., 154 F.3d 344, 352 (6th Cir. 1998). Although the Sixth Circuit has held that "to be deemed 'similarly-situated,' the individuals with whom [the plaintiff] seeks to

compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it," Mitchell, 964 F.2d at 583, the Sixth Circuit has subsequently noted that "Mitchell itself only relied on those factors relevant to the factual context in which the Mitchell case arose-an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment." McMillan v. Castro, 405 F.3d 405, 413 (6th Cir 2005) (citing Ercegovich, 154 F.3d at 352). The McMillan court clarified that the specific factors addressed in Mitchell are not necessarily relevant in cases that do not involve disciplinary action. Id. In such cases, the court "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Id.; see also Seay v. Tenn. Valley Auth., 339 F.3d 454, 479-80 (6th Cir. 2003) (noting that Mitchell's "same supervisor" language has never been read as imposing an inflexible requirement and this particular factor was not relevant to the Seay plaintiff's claim).

The Sixth Circuit has held in the context of a reorganization that a plaintiff whose position has been eliminated and who is denied an opportunity to transfer to another position can establish a prima facie case of discrimination by producing evidence that demonstrates "1) [she] is a member of a protected class; 2) at the time of [her] termination [she] was qualified for other available positions within the corporation; 3) the

employer did not offer such positions to the plaintiff; and 4) a similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position, or other direct, indirect, or circumstantial evidence supporting an inference of discrimination." Ercegovich, 154 F.3d at 351.

In order to establish an "adverse employment action" so as to satisfy the second prong of a prima facie case, the plaintiff must show "a materially adverse change in the terms and conditions of [her] employment." Hollins v. Atlantic Company, 188 F.3d 652, 662 (6th Cir. 1999). A change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996) (quoting Crady v. Liberty Nat'l Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)). A materially adverse change might be indicated by a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id.

"[T]he precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Moreover, the plaintiff's burden at the prima facie stage of the proceedings is not onerous, but "merely serves to raise a rebuttable presumption of

discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'"  <u>Cline v. Catholic Diocese</u>, 206 F.3d 651, 660 (6th Cir. 2000) (citing <u>Hollins</u>, 188 F.3d at 659 (quoting <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253-54 (1981)).

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case.  If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  If the employer carries its burden, the plaintiff must prove by a preponderance of the legal evidence that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination.  <u>Id</u>. at 804.

The United States Court of Appeals for the Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the adverse employment decision; or 3) the reasons were insufficient to warrant the decision made.  <u>Manzer</u>, 29 F.3d at 1084; <u>McDonnell Douglas</u>, 411 U.S. at 802  The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, that is, the reason is factually false.  <u>Id</u>.  The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge.  <u>Id</u>.

11

Although the court should refrain from probing an employer's business judgment, business judgment is not an absolute defense to unlawful discrimination.  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003).  "[T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."  Id. (citing Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)).  The plaintiff may establish pretext by showing that the "asserted business judgment was so ridden with error that Defendant could not honestly have relied upon it."  Id. (quoting In re Lewis, 845 F.2d 624, 633 (6th Cir. 1988)).

## V.  Opinion

A.  Plaintiff's claims are not time-barred

Defendants construe ¶¶ 16, 17, 18, 20, 29 and 30 of the complaint as separate claims and argue that those "claims" were not filed within the 300-day statutory filing period.  Plaintiff asserts that these paragraphs do not present separate causes of action but instead set forth facts that establish the background for her discrimination claims and demonstrate a discriminatory intent on the part of UC to dry up her funding and force her out of her position.  It is apparent from a review of the complaint that the paragraphs cited by Defendants do not allege adverse employment actions giving rise to separate claims for relief.  Rather, those paragraphs set forth the events leading up to Plaintiff's termination and establish the context for her claims.  Plaintiff may therefore offer proof of

the allegations made in these paragraphs, even though the acts alleged may have occurred beyond the 300-day period preceding her termination, in order to provide the context for her claims and attempt to prove that Defendants acted with a discriminatory motive.

B.  Plaintiff has not established a prima facie case of sex discrimination

It is undisputed that Plaintiff has satisfied the first three elements of a prima facie case of sex discrimination.  Plaintiff is a female; she was qualified for her position; and she was subjected to an adverse employment action in that she was terminated from her employment.[2]  The parties disagree as to whether Plaintiff can establish the fourth element of a prima facie case.  Plaintiff cannot show that her position was filled by someone outside the protected class because there is no question her position was eliminated and she was not replaced.  Plaintiff argues, however, that she can show she was treated less favorably than male employees who were similarly situated to her, namely Eugene Rutz and Raj Arudi.  Plaintiff alleges that Rutz was permitted to serve as sole PI while he was a non-faculty member who was performing work on outside grants and contracts and that he was then moved to a non-research position when his funding ran out.  Plaintiff claims that Arudi, who was also a non-faculty member when the PI rule was first implemented, was moved to a research faculty position to avoid application of the PI rule to him.

_____

[2] Although plaintiff makes various allegations of disparate treatment in the complaint, it is clear from her memorandum in opposition to the motion for summary judgment that the only claim she is pursuing is a claim of discrimination based on the termination of her employment.

13

Defendants argue that Rutz and Arudi were not similarly situated to Plaintiff in all material respects.  Defendants also contend that although Plaintiff named a third individual in her complaint to whom she was allegedly similarly situated, Gerard Roberto, she has made no factual allegations regarding him in her memorandum in opposition to summary judgment.

A careful review of the record discloses that plaintiff has not come forward with sufficient evidence to show that she was similarly situated to any of the male employees with whom she seeks to compare her treatment.  Plaintiff has not come forward with any evidence regarding Roberto, so the record does not support a finding that she was similarly situated to him in all material respects.

Plaintiff seeks to compare herself to Rutz and Arudi as of 2000 when the PI rule was first imposed, arguing that imposition of the rule led to her lack of funding and termination three years later.  Whether Plaintiff is compared with Rutz and Arudi as of 2000 when the PI rule was first imposed or as of 2003 when her employment was terminated, the only reasonable conclusion to be drawn is that Plaintiff and these individuals were not similarly situated.  Arudi, who had a PhD, held a research faculty position whereas plaintiff, who had a high school diploma, did not hold a research faculty position.  While Plaintiff alleges that Arudi was moved into the research faculty position at some point to avoid application of the PI rule to him, she cites no evidence to support her allegation that this was the motive for Arudi's transfer.  Nor does plaintiff allege that

Arudi was not bound by the PI rule prior to his transfer to the research faculty position so as to support a finding that she was treated less favorably than Arudi during the period that they were both Research Associates.

As for Rutz, the record shows that the employment situations of Plaintiff and Rutz varied in many critical respects. First, the two had different credentials. As noted earlier, Plaintiff's formal education is limited to a high school diploma. Rutz, on the other hand, had a bachelor's degree in nuclear engineering and a master's degree in mechanical engineering, and he was certified in distance learning. (Rutz depo., pp. 5-6).

Second, Rutz and Plaintiff had very different duties. Although Rutz had been a Research Associate in the Physics Department from 1989 to 1992 or 1993 and then in the Mechanical/Industrial/Nuclear Engineering Department until 2000, he moved to the position of Academic Director at the college administrative level in 2000, at which time his title of Research Associate was dropped. (Rutz depo., pp. 11-13, 22, 29-30). Rutz's job responsibilities as Academic Director included development of content, working with business learning technology, and devising budgets for academic programs. (Rutz depo., p. 31). Plaintiff had no comparable administrative duties. In addition, Rutz had been involved with the distance learning program at UC since 1995, and he eventually became director of professional development and distance learning. (Rutz depo., pp. 20-21, 30). He also taught courses at UC periodically and was available as an adjunct professor. (Rutz depo., p. 26).

Third, the salaries for Plaintiff and Rutz were funded from different sources.

15

While Rutz was a Research Associate, he was funded largely by research projects for which Leroy Eckart, Head of the Mechanical/Industrial/Nuclear Engineering Department from 1990 to 1995 and Associate Dean for Academic and Administrative Affairs of the College of Engineering from 1995 to 2004, was the PI. (Eckart depo., pp. 8, 40-41). As Eckart's projects wound down, Eckart began to move Rutz into administrative areas, such as work related to enrollment and technical report writing, where most of his funding came from gifts to the College of Engineering, which the Dean controls, and endowment funds. (Eckart depo., p. 41; Rutz depo., p. 32). By contrast, Plaintiff was responsible for securing her own funding through outside grants and contracts.

These numerous differences between Plaintiff's position and duties and those of Rutz preclude a finding that she and Rutz were similarly situated in all material respects. Plaintiff has not offered any other circumstantial evidence that supports an inference of discrimination and is sufficient to establish a prima facie case of sex discrimination. Defendants are entitled to summary judgment on plaintiff's sex discrimination claims on this basis.

C. Plaintiff has failed to produce evidence of pretext

Assuming, arguendo, that Plaintiff has come forward with sufficient evidence to establish a prima facie case of sex discrimination, Defendants have articulated a legitimate, non-discriminatory reason for the decision to terminate Plaintiff's employment. Defendants assert that Kukreti recommended that Plaintiff's employment be terminated because she no longer had funding available to support her position.

16

Kukreti testified at his deposition that the Business Manager had brought Plaintiff's lack of funds to his attention; Plaintiff's records showed no funding was available; Plaintiff had been supporting herself with RIA funds for the last few months preceding her termination, although RIA funds were not intended for that purpose but were instead meant to generate additional research funding; Plaintiff's RIA money had been exhausted as of the date the termination decision was made; she had no proposals written to show that funds would be forthcoming to support herself; and after receiving the letter informing her of her termination, Plaintiff did not make Kukreti aware of any source of funding that might be forthcoming. (Kukreti depo., pp. 15-17, 19-21, 23, 26-27, 32-33, 67). Kowel testified at his deposition that he approved the recommendation because Plaintiff had no prospects for support. (Kowel depo., pp. 64-65).

Plaintiff claims that the reason articulated by Defendants for the termination of her employment is false. Plaintiff alleges that she in fact had several sources of funding available at the time she was notified of her termination. Specifically, Plaintiff claims that she had three months accrued vacation pay, a project lined up with Dr. Richard Miller, RIA money accrued on research that had not been transferred to her RIA account since September 2002, and royalty revenues generated by the patent that she held.

The evidence Plaintiff has produced is not sufficient to create a genuine issue of fact as to whether the reason offered by Defendants for terminating her employment is pretextual. First, it is undisputed that the funds identified by Plaintiff did not appear in her records as of the date of her termination. In addition, Plaintiff testified at her

17

deposition that she does not know the amount of the RIA funds that allegedly had been generated but had not been deposited into her account, she has no evidence to substantiate her claim regarding these funds, and she never brought the alleged error to anyone's attention.  (Plaintiff's depo., pp. 97, 283).  Plaintiff also testified at her deposition that she never identified to either Kukreti or Kowel any funds that could be used to pay her salary after April 14, 2003.  (Plaintiff's depo.,  pp. 101-02).  Furthermore, the record shows that the project with Dr. Miller was to have generated only $4,013 to be paid over the period September 3, 2003 to January 5, 2005.  (Miller Declaration, pp. 1-2).  Finally, there is no evidence in the record that vacation pay and patent royalties were sufficient or acceptable substitutes for funding from grants and contracts.  Thus, Plaintiff has not shown that she in fact had sufficient sources to fund her position and that Defendant was aware of those sources at any time prior to her termination.  Her unsubstantiated allegations to the contrary cannot support a finding that the reason provided for her termination is false and is a pretext for sex discrimination.

As additional evidence of pretext, Plaintiff claims that when similarly-situated males like Rutz and Roberto faced similar shortages of contract funding, Kowel and Kukreti found other non-research positions for them to save their employment but failed to do the same for Plaintiff.  Plaintiff's allegation is insufficient to establish pretext because she has made no factual allegations whatsoever regarding Roberto and, for the reasons stated above, the evidence does not permit a finding that Rutz and Plaintiff were similarly situated in all material respects.  Furthermore, the undisputed evidence

demonstrates that it was Eckart who insured that Rutz's appointment did not come to an end since Eckart considered Rutz to have the skills Eckart needed at the time Rutz's funding was coming to an end and Eckart viewed him as well-suited for an administrative position, whereas Eckart played no role in any funding or employment decisions involving Plaintiff.  (Eckart depo., pp. 42-43, 50).   Finally, the record shows that Defendants treated a male Research Associate in the CEED whose funding was eliminated as the result of the expiration of a research project, Andrew Martyniuk, in the same manner as Plaintiff by abolishing his position and terminating his employment at the request of Kukreti and Kowel in 2001.  (Motion for Summary Judgment, Exh. 7).  Under these circumstances, Defendants' decision to not seek out other funding or positions for Plaintiff despite doing so for Rutz does not cast doubt on the validity of their assertion that they terminated Plaintiff's employment because her records showed that she had no more sources of funding.

Plaintiff also claims that UC's reasons for imposing the PI rule are pretextual.  In making this argument, Plaintiff construes the PI rule as an adverse employment action that was designed to block her from obtaining funding and which led directly to her termination.  Defendants contend that UC had the following non-discriminatory reasons for adopting the policy and Plaintiff cannot prove those reasons were a pretext for sex discrimination: First, Kowel felt it was appropriate for a faculty member to be involved as a co-PI on every research project since only the faculty is responsible for the research mission of UC; second, the faculty member co-PI helps to insure that UC meets its

19

contractual obligations to the contractors and grantors since it is UC, not the individual researcher, who is contractually responsible under all grants and contracts; third, the new policy allowed the faculty to participate in all research projects performed by non-faculty members and insure research quality, which was a concern of the College of Engineering faculty; fourth, Kowel felt that if the faculty got involved as co-PI's with research work at Fernald, then Fernald work could be "significantly broadened."

Plaintiff denies that the rationale articulated by Defendants for the policy is the true rationale.  She claims that there are genuine disputes as to who created the policy and what the terms of the policy were.  Plaintiff contends that according to Kowel, she and other non-faculty members had no other restrictions with regard to communications with funding agencies, but in fact the policy prohibited her from contacting funding sources on her own, visiting funding agencies without notifying Dr. Bishop in advance, and meeting with funding agencies without a faculty member present.  Plaintiff alleges that although Kowel testified that he was not sure the College of Engineering should be doing the type of research she was conducting, he in fact knew the research was good and that it was a good fit for UC, and others in her department saw her work as valuable and as a positive reflection on UC.  Plaintiff further avers that although Kowel testified that the rationale for the policy was to improve the distribution of contracts coming out of the Fernald site among the faculty members, the actual distribution of contracts showed that this was not a problem at the time.  Plaintiff asserts that Kowel testified the policy was designed to insure that a responsible person was in charge of each contract, but the only time he

served as a PI on a contract, he was not competent in the field the contract involved and he cannot remember what he lent to the contract.  Plaintiff also alleges that Rutz was permitted to serve as sole PI on research projects and that he and Arudi were eventually moved to positions where they were not bound by the policy.

As an initial matter, Plaintiff has failed to produce evidence sufficient to permit a finding that imposition of the PI rule was an adverse employment action.  Plaintiff argues that being a PI carries a certain amount of prestige, but she concedes that the policy did not preclude her from acting as PI on a project, so long as she had a faculty member serve as co-PI, and she has not demonstrated how the policy negatively impacted her ability to acquire grants and contracts.  Indeed, Plaintiff continued to fund her position for nearly three years following imposition of the rule, and she suggests that she could have continued to fund her position despite the rule in that she argues she would have secured funds after a short gap in funding which occurred around the time of her termination, just as she always had.  (Plaintiff's depo., p. 97).

Assuming, arguendo, that imposition of the PI rule was an adverse employment action, Plaintiff has failed to show that the asserted reasons for the policy are false or are otherwise a pretext a for sex discrimination.  To the contrary, Plaintiff simply questions Defendants' business judgment.  While Plaintiff and others may have disagreed with the wisdom of the PI policy and with the need for the policy, Plaintiff has not produced evidence to show that Defendants' asserted business judgment in this regard "was so ridden with error that Defendant could not honestly have relied upon it."  See Wexler,

317 F.3d at 576.

Plaintiff has not offered any other evidence that the nondiscriminatory reason articulated by Defendants for her termination is a pretext for sex discrimination. For this reason, Defendants are entitled to summary judgment on Plaintiff's sex discrimination claims.

D. Plaintiff has not produced evidence of a gender bias

Plaintiff alleges that the evidence establishes that Kowel and Kukreti, the decision-makers with regard to her termination, harbored an animosity against her that they cannot explain and from which an inference can be drawn that they acted against her on account of her sex. Plaintiff argues that this animosity is demonstrated by the fact that they stamped the memo approving her dismissal "**APPROVED!**"; they made no efforts to soften the impact of her termination or to seek her input as to how to fund her position under the circumstances that existed in March 2003; Kowel made a false statement in July 2000 designed to keep Plaintiff from receiving a contract from Fluor Corporation for work at the Fernald site; Defendants imposed a 4% "technician and equipment maintenance tax" on all grants and contracts in the CEED to pay for technicians and maintenance contracts utilized by faculty members when Plaintiff did not use technicians, thereby reducing the financial burden on the other PI's, all of whom were men, and increasing the financial burden on her; and Kukreti misaddressed the letter notifying her of her dismissal and did not meet with her in person. While the fairness of certain of Defendants' actions is debatable, there is no evidence that these particular actions were

22

motivated by a discriminatory animus.  Absent such evidence, a reasonable fact-finder

cannot infer that Defendants terminated Plaintiff's employment because of her gender.

VI.  <u>Conclusion</u>

The record does not support a reasonable inference that any of the Defendants

discriminated against Plaintiff because of her sex.  Accordingly, Defendants' motion for

summary judgment is well-taken and is **GRANTED** as to all claims.  Plaintiff's claims

are **DISMISSED WITH PREJUDICE.  THIS CASE IS CLOSED.**

**IT IS SO ORDERED.**


Date: <u>July 5, 2006</u>                          <u>S/ Sandra S. Beckwith        </u>
                                         Sandra S. Beckwith, Chief Judge
                                          United States District Court

23